UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| UNITED STATES OF AMERICA, | Case No. 4:17-cr-00132-BLW |
|---|---|
| Plaintiff, | MEMORANDUM DECISION AND ORDER |
| v. | |
| MICHAEL JOHN WROBEL, | |
| Defendant. | |

# INTRODUCTION

Pending before the Court is Defendant Michael John Wrobel's Motion to Suppress. While driving northbound on I-15 at approximately 7:11 pm on April 8, 2017, Mr. Wrobel was pulled over by Idaho State Police Trooper Kenneth Peeples for failing to signal for five seconds before changing lanes. During the traffic stop, Trooper Peeples asked Mr. Wrobel to exit his vehicle, conducted a patdown, and then conducted a canine search of the exterior and interior of Mr. Wrobel's car. Based on the behavior of his K-9 Partner, Trooper Peeples determined he had probable cause to search the vehicle. During the search, Trooper Peeples discovered a substance that field-tested positive for methamphetamine and arrested Mr. Wrobel. Mr. Wrobel moves to suppress the evidence obtained from Trooper Peeples's search of the vehicle on the grounds that Trooper Peeples violated his Fourth Amendment rights by unlawfully prolonging the traffic stop and conducting a search of his vehicle.

The Court heard testimony at an evidentiary hearing on December 5, 2017, and received closing briefs from the parties on December 11, 2017. For the reasons explained below, the Court will grant the motion.

## BACKGROUND

While patrolling I-15 on April 8, 2017, Trooper Peeples observed Mr. Wrobel change lanes without signaling for five seconds, as required by Idaho law. *Def.'s Br.* Ex. A at 3, Dkt. 18-2. Trooper Peeples pulled Mr. Wrobel over, and approached the passenger side window of the vehicle. *Id.* When he arrived at the vehicle, Trooper Peeples noticed that Mr. Wrobel had rolled down both front windows. *Id.* Trooper Peeples explained why he had stopped Mr. Wrobel, and asked him for his license, registration, and insurance. *Id.* As Mr. Wrobel retrieved the relevant documents, Trooper Peeples invited him to roll up the driver's side window, and asked him where he was "headed up to now." *Def.'s Br.* Ex. B at 19:13:13, Dkt. 18-3. Mr. Wrobel rolled the window halfway up, and informed Trooper Peeples he was going to see a friend in Montana. *Def.'s Br.* Ex. A at 3, Dkt. 18-2. When Trooper Peeples asked how long he would be in Montana, Mr. Wrobel replied he was going for about three days. *Id.*

As they spoke, Trooper Peeples noticed the strong smell of air freshener coming from the vehicle, and that Mr. Wrobel's upper lip quivered when he spoke. *Id.* He again invited Mr. Wrobel to roll up the driver's side window, which was still halfway down, and Mr. Wrobel complied. *Id.* Trooper Peeples also noticed a lighter and used ashtray in

the center console, and identified the program playing on the car radio as a Mormon religious music program. *Id.*

Mr. Wrobel handed Trooper Peeples the documents he requested, including his rental agreement. *Id.* The agreement showed that the vehicle was rented in Los Angeles on April 4, 2017 and had a return date of April 25, 2017. *Id*. Trooper Peeples then asked Mr. Wrobel to close his eyes. *Id.* After a moment, Trooper Peeples returned to his patrol car. *Id.* At this point, Trooper Peeples had developed a suspicion that Mr. Wrobel was involved in criminal activity based on his actions, the answers he gave to Trooper Peeples's questions, and Trooper Peeples's observations of him in comparison with other interactions he had in the past. *Id.* Specifically, Trooper Peeples relied on the following facts: 1) The strong smell of air freshener in the vehicle; 2) the fact that Mr. Wrobel was driving a rental vehicle; 3) the fact that Mr. Wrobel rolled down both windows, and didn't immediately roll up the driver's side window all the way when invited; 4) the fact that Mr. Wrobel planned to be in Montana for about three days but had rented the car for three weeks; 5) the fact that Mr. Wrobel's lip quivered when he spoke; and 6) the fact that he was playing Mormon religious music, which Trooper Peeples believed could indicate that Mr. Wrobel was overcompensating by attempting to affiliate with the local religious community. *Id*.

When Trooper Peeples returned to his patrol car, he reviewed the documents briefly and asked dispatch to conduct a wants and warrants check and a prior controlled substance criminal history check on Mr. Wrobel. *Id.* He then exited his patrol car and

returned to Mr. Wrobel's vehicle. *Id.* Trooper Peeples testified that when he decided to approach the vehicle for the second time, he was already suspicious that Mr. Wrobel was involved in criminal activity. He stated that he intended to conduct the dog sniff unless Mr. Wrobel's acted in some way to dispel that suspicion. Specifically, Trooper Peeples testified that he intended to conduct the dog sniff unless Mr. Wrobel's nervousness abated.

When Trooper Peeples approached the car for the second time, he asked Mr. Wrobel if there was anything illegal inside the car. *Id.* Mr. Wrobel responded "no, no, no." *Id.* Trooper Peeples then asked whether his K-9 partner, Apollo, would alert to the odor of drugs coming from the car. *Id.* Mr. Wrobel shook his head. *Id*. Trooper Peeples asked Mr. Wrobel to exit the vehicle. *Id.* Mr. Wrobel asked why he needed to exit the vehicle. *Id.* Trooper Peeples explained that he was going to have Apollo walk around the car. *Id.*

Holding the keyless ignition fob in his hand, Mr. Wrobel pressed the ignition button on the dash of the car. *Id.* Trooper Peeples testified that he heard the engine turn over, and asked why Mr. Wrobel turned the car on. Mr. Wrobel stated he was turning it off. *Id*. Trooper Peeples noted that the key fob did not have a rental car tag on it. *Id.* Mr. Wrobel exited the vehicle and consented to a pat down search, which Trooper Peeples performed. *Id.* at 4. As Trooper Peeples completed the pat down search, dispatch informed him there were no outstanding warrants for Mr. Wrobel. *Def's Br.* Ex. B at

19:17:41, Dkt. 18-3. Trooper Peeples then retrieved his K-9 partner from the car, and walked him on the leash around the vehicle. *Def.'s Br.* Ex. A at 4, Dkt. 18-2.

Trooper Peeples and his K-9 partner are certified in drug detection. *Id*. When he approached the vehicle, Apollo jumped on his hind legs and sniffed inside the open passenger window. *Def's Br.* Ex. B at 19:18:11-19:18:34, Dkt. 18-3. He also jumped on his hind legs near the trunk of the car, and sniffed the driver's side door handle. *Id*. at 19:18:34-19:18:50. Apollo then walked back to the passenger window, and jumped through the window into the car. *Id*. at 19:18:55. Trooper Peeples assisted Apollo into the vehicle, and called for backup. *Id*. According to Trooper Peeples, he then observed Apollo engage in a trained response, which indicated the presence of illegal drugs on the driver's side floorboard. *Def.'s Br.* Ex. A. at 4, Dkt. 18-2. Trooper Peeples returned Apollo to his patrol car, and conducted a search of the vehicle, during which he discovered the methamphetamine at issue. *Id.*

## LEGAL STANDARD

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted). Thus, the "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons" subject to the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809–10 (1996).

"A seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015). But an officer's authority for such a seizure ends "when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*. "The Government's endeavor to detect crime in general or drug trafficking in particular cannot justify prolonging an ordinary traffic stop." *United States v. Gorman*, 859 F.3d 706, 715 (9th Cir. 2017) (internal quotations omitted) (citing *Rodriguez*, 135 S. Ct. at 1616). Thus, an officer may prolong a traffic stop to conduct an investigatory action only where he has "independent reasonable suspicion" of criminal activity. *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015).

Evidence obtained as a result of an unreasonable search or seizure is "ordinarily tainted by the prior illegality and thus inadmissible, subject to a few recognized exceptions." *Gorman*, 859 F.3d at 716 (internal quotations omitted). Where an "illegal stop was the impetus for the chain of events" that led to the discovery of the evidence in question, that evidence is inadmissible. *Id*. The burden of demonstrating that evidence obtained as a result of an extrajudicial search or seizure is admissible rests with the Government. *See id* ("the burden of showing admissibility rests on the prosecution.").

## ANALYSIS

Mr. Wrobel argues that the evidence of methamphetamine found in his vehicle must be suppressed because Trooper Peeples did not have reasonable articulable suspicion to prolong the traffic stop to conduct a dog sniff. The government has conceded that Trooper Peeples prolonged the traffic stop when he conducted the dog sniff after

dispatch returned the wants and warrants check on Mr. Wrobel. *Pl.'s Br.* at 7, Dkt. 23. The Defense contends, however, that Trooper Peeples abandoned the traffic stop prior to the return of the wants and warrants check, when he ordered Mr. Wrobel out of the vehicle. *Def.'s Br.* at 3, Dkt. 33.

As an initial matter, the Court finds that a police officer unlawfully expands the scope of a traffic stop when he compels a person to exit their vehicle for investigative purposes unrelated to the mission of a lawful traffic-stop, absent a reasonable articulable suspicion the person is engaged in criminal activity. The Fourth Amendment imposes "limitations upon the scope, as well as the initiation, of police action." *Terry v. Ohio*, 392 U.S. 1, 17 (1968). The reasonableness of the scope stems from the mission of the seizure. *See Rodriguez*, 135 S. Ct. at 1614 (citing *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification."). Because "the scope of a search [or seizure] must be strictly tied to and justified by the circumstances which rendered its initiation permissible," a valid search or seizure may become unreasonable "by virtue of its intolerable intensity and scope" *Terry*, 392 U.S at 18-19. Thus, the determination of whether a seizure is unreasonable rests on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19-20.

The reasonableness of a traffic stop is determined by its mission "to address the traffic violation that warranted the stop." *See Rodriguez*, 135 S. Ct. at 1614. "Requiring a

driver, already lawfully stopped, to exit the vehicle," is considered part of the mission of the stop when doing so is justified by the government's interest in completing the stop safely. *Id.* at 1615-16. In contrast, investigations of non-traffic related crimes depart from the mission of the stop, and "so to do safety precautions taken in order to facilitate such detours." *Id.* at 1616. Thus, investigatory actions and their attendant safety precautions must be justified by a reasonable articulable suspicion that the seized individual is engaged in criminal activity when they expand the scope of a seizure by prolonging a traffic stop. *See id*. at 1615 ("An officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent reasonable suspicion ordinarily demanded to justify detaining an individual.").

Ordering a person to exit their vehicle for purposes unrelated to the traffic similarly expands the scope of a seizure.[1] Because the additional intrusion is motivated merely by the government's general interest in criminal enforcement, it cannot be justified as part of the mission of the stop. *See id*. at 1615-16. The *Rodriguez* court held that such an intrusion is outweighed by an interest in officer safety where that interest "stems from the mission of the stop itself." *Id* at 1616. But an exit order "could not be justified on the same basis" if it stemmed from an unrelated criminal investigation. *Id.* (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 110-111 (1977).

---

[1] The Supreme Court has held that less intrusive investigatory measures, such as questioning or conducting a dog sniff, do not expand the scope of a traffic stop, and thus are lawful so long as they don't prolong the stop. *See Rodriguez*, 135 S. Ct. at 1614. It has not addressed exit orders in the context of non-traffic related investigations.

Instead, assessing reasonableness requires balancing "the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interest . . . against the invasion which the search (or seizure) entails." *Terry*, 392 S. Ct. at 21. While such an intrusion may be "*de minimis*" when compared to the "legitimate and weighty" interest in office safety, *Mimms*, 434 U.S. at 110-111, it is significantly more substantial when balanced against a general interest in criminal enforcement. *See Rodriguez*, 135 S. Ct. at 1616. Thus, where an officer expands the scope of a traffic stop by ordering a person to exit their vehicle for investigatory purposes, he must have reasonable articulable suspicion that the person is engaged in criminal activity. Here, Trooper Peeples did not instruct Mr. Wrobel to exit the vehicle due to concerns about his ability to conduct the traffic stop safely. Rather, he did so for the express reason of facilitating an unrelated criminal investigation. Thus, the government must show that Trooper Peeples had reasonable suspicion that Mr. Wrobel was engaged in criminal activity when he exited the vehicle.

The Court finds that the facts known to Trooper Peeples at the time he instructed Mr. Wrobel to exit his vehicle did not support a reasonable articulable suspicion that Mr. Wrobel was engaged in criminal activity. Therefore, the seizure became unlawful at that point in time. However, even if the Court ignores Trooper Peeples' order that Wrobel exit the vehicle, it would still find that Peeples did not have reasonable articulable suspicion when he further prolonged the stop to conduct a dog sniff.

### 1. Legal Standard for Reasonable Suspicion

"Reasonable suspicion exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *Evans*, 786 F.3d at 788. (internal quotations omitted). In determining whether an officer was justified in prolonging a traffic stop to conduct a dog sniff, courts must look to whether "the officer's testimony concerning the relevant facts [is] credible," and whether those facts objectively create reasonable, particularized suspicion that a person is engaged in criminal activity. *Id.* at 788-89.

"The requirement of *particularized* suspicion encompasses two elements. First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *United States v. Montero-Carmago*, 208 F.3d 1122, 1129 (9th Cir. 2000) (internal citations omitted). "Accordingly, we have rejected profiles that are likely to sweep many ordinary citizens into a generality of suspicious appearance." *Id.* (internal quotations omitted).

The totality of the circumstances test is objective, and considers not only the factors that an officer subjectively relied on, but also any factors known by him that would reasonably contribute to or mitigate suspicion that a person was engaged in criminal activity. *See United States v. Manzo-Jurado*, 457 F.3d 928, 938 (9th Cir. 2006) (finding that "the totality of the circumstances test takes into account both factors weighing for and against reasonable suspicion."). Thus, while "conduct that is not

necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus . . . innocuous conduct does *not* justify an investigatory stop unless there is other information or surrounding circumstances of which the police are aware, which, when considered along with the otherwise innocuous conduct, tend to indicate criminal activity has occurred or is about to take place." *Montero-Carmago*, 208 F.3d at 1130 (internal citation omitted).

Trooper Peeples articulated the following facts in support of his initial suspicion that Mr. Wrobel was involved in criminal activity:

> (1) The strong smell of air freshener in the vehicle, indicating an attempt to cover up the smell of drugs;
>
> (2) the fact that Mr. Wrobel was driving a rental vehicle, which are often used in drug smuggling;
>
> (3) the fact that Mr. Wrobel rolled down both windows, and didn't immediately roll up the driver's side window all the way when invited, again indicating an attempt to cover up the smell of drugs;
>
> (4) the fact that he planned to be in Montana for about three days but had the rental car for three weeks, indicating vague and evasive answers about his travel plans;
>
> (5) the fact that Mr. Wrobel's lip quivered when he spoke, indicating nervousness; and
>
> (6) the fact that he was playing Mormon religious music, which Officer Peeples believed could indicate that he was overcompensating by attempting to affiliate with the local religious community.

In their brief, the government also cites the fact that Mr. Wrobel was traveling on I-15, a "common corridor for smuggling drugs into the northwest." *Pl.'s Br.* at 8, Dkt. 23.

Trooper Peeples testified at the suppression hearing that he suspected Mr. Wrobel was engaged in criminal activity after their initial encounter, and he proceeded to conduct the dog sniff because Mr. Wrobel's nervousness did not abate during their second interaction. In his report, Trooper Peeples did not mention Mr. Wrobel's continued nervousness, and instead indicated that upon approaching the vehicle a second time, the following factors contributed to his suspicion:

> (1) the Defendant paused, broke eye contact, and asked why he was being asked to exit the vehicle;
>
> (2) the Defendant pressed the start/stop button on the car before exiting the vehicle;
>
> (3) the key fob did not have a rental company tag attached to it.

Taking into account the totality of the circumstances, the Court finds that the facts to not support a finding that reasonable articulable suspicion existed to justify expanding the scope of the traffic stop, either at the point Trooper Peeples ordered Mr. Wrobel out of the car, or when he admittedly prolonged the traffic stop by conducting a dog sniff after the wants and warrants check was returned.

### 2. Reasonable Articulable Suspicion for the Exit Order

Several of the factors the government relies on to show that reasonable articulable suspicion existed carry little weight because they "describe too many individuals to create a reasonable suspicion that this particular defendant was engaged in criminal activity." *United States v. Rodriguez*, 976 F.2d 592, 596 (9th Cir. 1992) (rejecting "profile[s] of specific behavior very likely to sweep many ordinary citizens into a generality of

suspicious appearance merely on a hunch."). Although drug smugglers may be likely to use rental cars, drive north on I-15, listen to local radio, and display nervousness when stopped by police, these factors also describe hundreds, if not thousands of law-abiding citizens. *See id* (declining to accept as the basis of reasonable suspicion a profile which "could certainly fit hundreds or thousands of law-abiding daily users of the highways of Southern California."). The Ninth Circuit explicitly rejected officers' reliance on such broad profiles to create reasonable suspicion, because they sweep in innocents along with criminals, and lack any "particular, individualized, and objectively observable factors which indicate that [a] person is engaged in criminal activity." *Id*. Thus, the Court rejects the government's proposal that the similarly broad factors cited here support a reasonable suspicion that Mr. Wrobel was engaged in criminal activity. Instead, the Court must look to facts particular to Trooper Peeples's interaction with Mr. Wrobel.

Trooper Peeples testified that he suspected Mr. Wrobel was attempting to cover up the smell of narcotics in his vehicle, because he observed that there was a strong smell of air freshener in the car, and because typically rental cars do not come with air freshener. While a strong odor of air freshener may contribute to reasonable suspicion, *see, e.g.*, *United States v. Rojas Millan*, 234 F.3d 464, 470 (9th Cir. 2000) (finding a strong smell of perfume contributed to the officer's reasonable suspicion), air fresheners are "commonly employed to mask a myriad of other odors," *United States v. Guerrero*, No. 03-cr-138, 2003 WL 21976022, at *4 (S.D. Iowa Aug. 14, 2003), including the smell of cigarette smoke. In addition to the smell of air freshener, Trooper Peeples observed an

ash tray and cigarette butts in the center console of Mr. Wrobel's vehicle. Rental companies typically prohibit smoking in rental cars, and charge substantial cleaning fees when renters smoke in their vehicles. Thus, it is not particularly suspicious for a driver to obtain and use air freshener when smoking cigarettes in a rental car.[2]

Nor were Mr. Wrobel's travel plans so "oddly vague" as to create objective reasonable suspicion that he was engaged in criminal activity. *Rojas-Millan*, 234 F.3d at 470. In *Rojas-Millan*, the Ninth Circuit found the defendant's travel plans to be "oddly vague" and sufficient to establish reasonable suspicion when the defendant had driven nearly 200 miles to meet a friend, but did not know where he was meeting the friend or how to get in touch with him. *Id*. Further, the defendant in *Rojas-Millan* indicated that after meeting his friend, he intended to make the 200-mile return trip, "a considerable distance for such a short visit," that same night. *Id.* The officer specifically testified that the defendant's travel plans suggested "a drug delivery or some type of delivery of something illegal." *Id.*

Here, Trooper Peeples testified that he found it suspicious Mr. Wrobel intended to go to Montana for "maybe three days," because his rental agreement was for three weeks, and because "drug traffickers are often vague about trip details and tell conflicting stories to cover up their real trip plans." *Pl.'s Br.* at 8, Dkt. 23. But Trooper Peeples only asked

---

[2] This may also explain why Mr. Wrobel left his driver's side window down. Even absent this explanation, however, the Court does not agree that Mr. Wrobel's initial failure to roll up his driver's side window, while also searching for and his paperwork and responding to questions from Trooper Peeples, reasonably indicated that he was attempting to cover up the smell of narcotics.

Mr. Wrobel where he was headed "up to now" and failed to ask any follow-up questions regarding Mr. Wrobel's itinerary. Nor did he inquire about the length of Wrobel's rental agreement, or any apparent discrepancy between the length of the rental and Mr. Wrobel's travel plans. Mr. Wrobel did not tell any stories that conflicted with his plans to go to Montana for approximately three days. Nor was his trip plainly inconsistent with the long-term rental, particularly given the absence of facts establishing his subsequent plans. And, unlike driving 400 miles in one day for a brief meeting with a friend, going to Montana for "probably three days" is not so odd that it reasonably suggests a person is engaged in drug delivery or other illegal activity. Thus, the Court finds that Mr. Wrobel's travel plans do not support a reasonable suspicion that he was engaged in criminal activity.

Finally, the Court does not assign any weight to Trooper Peeples's testimony that Mr. Wrobel's reaction to being asked if there were drugs in the vehicle made Peeples suspicion of criminal activity. Trooper Peeples testified that the denial Mr. Wrobel gave to his first question, "no, no, no" was suspicious, but could not articulate why. He testified that repeating the word no could be interpreted either as adamant, or as not adamant. Trooper Peeples also testified that the denial Mr. Wrobel made to the second question, shaking his head, was suspicious because it was not adamant enough. The Court finds that, even accounting for officer experience and training, the Goldilocks standard employed by Trooper Peeples is inherently subjective. Thus, it is insufficient to support an objective reasonable suspicion of criminal activity.

For these reasons, the Court finds that the facts known to Trooper Peeples at the time he ordered Mr. Wrobel to exit the vehicle were not sufficient to support a reasonable articulable suspicion, and thus that Trooper Peeples unlawfully expanded the scope of the traffic stop at that time. Because the exit order was the "impetus for the chain of events" leading to the discovery of the methamphetamine, that evidence is "tainted" by the illegality of the seizure and must be suppressed. *Gorman*, 859 F.3d at 716.

3.     **Reasonable Articulable Suspicion to Prolong the Stop**

Even if the Court were to conclude that the scope of the stop was not unreasonably expanded until it was prolonged to facilitate the use of a drug dog, the Court finds that the additional factors known to Trooper Peeples at that time were insufficient to support a reasonable suspicion of criminal activity. While an officer is entitled to draw inferences "from the facts in light of his experience, those inferences must be specific and reasonable in light of the circumstances." *Terry*, 392 U.S. at 27. "[C]onduct that is not necessarily indicative of criminal activity may, in certain circumstances, be relevant to the reasonable suspicion calculus." *Montero-Carmago*, 208 F.3d at 1130. But there must be "other information or surrounding circumstances of which the police are aware, which . . . tend to indicate criminal activity has occurred." *Id*. Here, the Court finds that the totality of the circumstances, including Trooper Peeples' second interaction with Mr.

Wrobel, do not give rise reasonable articulable suspicion, under the totality of the circumstances.[3]

First, the Court finds that the lack of a rental tag on the key fob was not suspicious. Based on the totality of Trooper Peeples's interaction with Mr. Wrobel, there is simply no evidence to support Trooper Peeples's theory that Mr. Wrobel intended to hide the fact that he was driving a rental car, such that the absence of a tag on the key fob is significant. Instead, Mr. Wrobel openly admitted to Trooper Peeples that he was driving a rental and readily provided two separate documents indicating the car was a rental during their first interaction.

Second, the Court finds that the fact that Mr. Wrobel appeared to start the car did not objectively and reasonably indicate he was considering fleeing the scene. Trooper Peeples testified that it appeared Mr. Wrobel started the vehicle when he pressed the start/stop button because the engine turned over. The video evidence shows that Trooper Peeples was startled by something, and his reaction appears consistent with an initial suspicion that Mr. Wrobel was considering fleeing. Objectively, however, maintaining

---

[3] The Court also finds that Trooper Peeples's subjective analysis of the second interaction was less credible because it appeared to be colored by his admitted predetermination that Mr. Wrobel was engaged in criminal activity. This finding is supported by contradictory testimony given by Trooper Peeples during the hearing, and the Court's own objective analysis of these factors. Thus, the Court considers all the relevant facts available to Trooper Peeples, but assigns less weight to the inferences Trooper Peeples drew from these facts. *See, e.g.*, *Terry*, 392 U.S. at 21 ("The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances").

that suspicion beyond the initial moment would require discarding the additional facts that were available to Trooper Peeples. Trooper Peeples testified that Mr. Wrobel made no attempt to put the car in drive. When asked why he turned the car on, Mr. Wrobel stated that he was turning it off, and exited the car without further delay. Trooper Peeples knew the car was a rental, and likely unfamiliar to Mr. Wrobel. The totality of the circumstances test must take into account "both factors weighing for and against reasonable suspicion." *Manzo-Jurado*, 457 F.3d at 938. Here, an objective analysis of the totality of the circumstances indicates that Mr. Wrobel was not contemplating fleeing, but was simply fumbling in an attempt to turn off a rental car with which he lacked familiarity.

Third, the Court does not find Trooper Peeples's interpretation of Mr. Wrobel's reaction to being instructed to exit the vehicle to be reasonable. Neither Trooper Peeples nor the government adequately explain why it would be objectively suspicious for a person to be confused or nonplussed at being asked to exit their vehicle and submit to a search after being pulled over for a minor traffic violation; or to question why they were being asked to do so. Nor do they explain how such behavior makes it more likely that a person is involved in criminal activity. Thus, the Court does not find that Mr. Wrobel's reaction to being asked to exit the vehicle reasonably contributed to a suspicion that he was engaged in criminal behavior.

Finally, the Court does not find that evidence of Mr. Wrobel's continued nervousness throughout the interaction was sufficient to give rise to reasonable suspicion.

Nervousness alone is insufficient to form the basis of reasonable suspicion. And even where it is a relevant factor among many, it carries little weight because "[e]ncounters with police officers are necessarily stressful for law-abiders and criminals alike." *See United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001) (holding that even extreme nervousness "does not support a reasonable suspicion of criminal activity" absent other particularized factors). Further, Trooper Peeples's testimony regarding Mr. Wrobel's nervousness was inconsistent. At the hearing, he stated it was the determinative factor in deciding to conduct the dog sniff, and that if Mr. Wrobel had not continued to display nervous behavior Trooper Peeples would have let him go with a warning. But Trooper Peeples's failure to even mention Mr. Wrobel's continued nervousness in the report he wrote documenting the stop undermines the credibility of his later testimony. Further, the fact that Trooper Peeples declined to document Mr. Wrobel's continued nervousness also undermines the suggested inference that it was any more pronounced than that of a typical driver. For these reasons, the Court finds that Mr. Wrobel's nervousness was insufficient to support reasonable suspicion.

The facts available to Trooper Peeples did not objectively give rise to a reasonable articulable suspicion that Mr. Wrobel was involved in criminal activity. Therefore, Trooper Peeples was not justified in prolonging the traffic stop after the wants and warrants check was returned. Rather, the factors relied on by Trooper Peeples are so broad as to sweep in "innocents as well as criminals," *Rodriguez*, 976 F.3d at 596. "Although factors consistent with innocent travel might, when taken together, amount to

reasonable suspicion," the Court finds that such is not the case given the facts presented here. *Id.* at 595 (internal citation omitted). As the discovery of the methamphetamine was the fruit of the unlawfully prolonged stop, it must be suppressed. *See Gorman*, 859 F.3d at 716.

Because the Court will grant the Defendant's Motion on the grounds that Trooper Peeples lacked reasonable articulable suspicion to expand or prolong the stop, it necessarily follows that he lacked probable cause to search Mr. Wrobel's vehicle. The Court will therefore not address that related argument by the Government.

**IT IS ORDERED:**

1. Defendant's Motion to Suppress (Dkt. 18) is **GRANTED**.

DATED: January 3, 2018

B. Lynn Winmill
Chief Judge
United States District Court